Fill in this information to identify your case:

United States Bankruptcy Court for the:

EASTERN DISTRICT OF MICHIGAN

Case number *(if known)* _____     Chapter    **11**

☐ Check if this an
   amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy          4/16

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and case number (if known).
For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | | |
|---|---|---|---|
| 1. | Debtor's name | **BillNat Corporation** | |
| 2. | All other names debtor used in the last 8 years<br>Include any assumed names, trade names and *doing business as* names | **DBA  Sav-On Drugs** | |
| 3. | Debtor's federal Employer Identification Number (EIN) | **38-2932922** | |

4. **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| **34550 Glendale St.**<br>**Livonia, MI 48150**<br>Number, Street, City, State & ZIP Code | P.O. Box, Number, Street, City, State & ZIP Code |
| **Wayne**<br>County | **Location of principal assets, if different from principal place of business**<br><br>Number, Street, City, State & ZIP Code |

5. **Debtor's website (URL)** _____

6. **Type of debtor**

■ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))

☐ Partnership (excluding LLP)

☐ Other. Specify: _____

**7.** **Describe debtor's business**

A. *Check one:*

☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))

☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))

☐ Railroad (as defined in 11 U.S.C. § 101(44))

☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))

☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))

☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))

■ None of the above

B. *Check all that apply*

☐ Tax-exempt entity (as described in 26 U.S.C. §501)

☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. §80a-3)

☐ Investment advisor (as defined in 15 U.S.C. §80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor.
See http://www.uscourts.gov/four-digit-national-association-naics-codes.

‗‗‗‗‗‗

**8.** **Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

☐ Chapter 7

☐ Chapter 9

■ Chapter 11. *Check all that apply:*

    ☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,566,050 (amount subject to adjustment on 4/01/19 and every 3 years after that).

    ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

    ☐ A plan is being filed with this petition.

    ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

    ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

    ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

☐ Chapter 12

**9.** **Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

■ No.

☐ Yes.

| | District | When | Case number |
|---|---|---|---|
| | ‗‗‗‗‗‗‗‗‗ | ‗‗‗‗‗‗‗‗ | ‗‗‗‗‗‗‗‗‗ |
| | District ‗‗‗‗‗‗‗‗‗ | When ‗‗‗‗‗‗‗‗ | Case number ‗‗‗‗‗‗‗‗‗ |

**10.** **Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list

☐ No

■ Yes.

| Debtor | **Frank W. Kerr Company** | Relationship | **Affiliate/Insider** |
|---|---|---|---|
| District | **Eastern District of Michigan - Southern Division** | When **8/23/16** | Case number, if known **16-51724** |

**11. Why is the case filed in *this district*?**

*Check all that apply:*

■ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

■ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

■ No

☐ Yes.   Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

     What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____
     Number, Street, City, State & ZIP Code

**Is the property insured?**

☐ No

☐ Yes.   Insurance agency _____

       Contact name _____

       Phone _____

---

■ **Statistical and administrative information**

**13. Debtor's estimation of available funds**

*Check one:*

☐ Funds will be available for distribution to unsecured creditors.

■ After any administrative expenses are paid, no funds will be available to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☐ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5001-10,000 | ☐ 50,001-100,000 |
| ■ 100-199 | ☐ 10,001-25,000 | ☐ More than100,000 |
| ☐ 200-999 | | |

**15. Estimated Assets**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ■ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ☐ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0 - $50,000 | ☐ $1,000,001 - $10 million | ☐ $500,000,001 - $1 billion |
| ☐ $50,001 - $100,000 | ☐ $10,000,001 - $50 million | ☐ $1,000,000,001 - $10 billion |
| ☐ $100,001 - $500,000 | ■ $50,000,001 - $100 million | ☐ $10,000,000,001 - $50 billion |
| ☐ $500,001 - $1 million | ☐ $100,000,001 - $500 million | ☐ More than $50 billion |

| Debtor | BillNat Corporation | Case number (if known) | |
|---|---|---|---|
| | Name | | |

## Request for Relief, Declaration, and Signatures

**WARNING -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.**

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is trued and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on    <u>October 13, 2017</u>
          MM / DD / YYYY

X _____

Signature of authorized representative of debtor

Title   **CRO**

**Jeffrey K. Tischler**
Printed name

---

**18. Signature of attorney**

X _____

Signature of attorney for debtor

Date   **October 13, 2017**
       MM / DD / YYYY

**Stephen M. Gross**
Printed name

**McDonald Hopkins PLC**
Firm name

**39533 Woodward Ave., Ste. 318**
**Bloomfield Hills, MI 48304**
Number, Street, City, State & ZIP Code

Contact phone   **248-646-5070**     Email address   **sgross@mcdonaldhopkins.com**

**P35410**
Bar number and State

# BillNat Corporation

### RESOLUTION OF THE
### BOARD OF DIRECTORS

**WHEREAS,** the undersigned, being the sole director (the "Director") of BillNat Corporation, a Michigan corporation (the "Company"), desires that the actions expressed in the following resolutions be, and same hereby are, taken by the Director of the Company as of the date appearing after these resolutions;

**WHEREAS,** the Company is engaged in the business of operating twenty retail pharmacies from leased facilities in Southeastern Michigan under the name "Sav-On Drugs" (the "Business");

**WHEREAS,** the Company has, due to various factors, been experiencing cash flow issues resulting in the Company defaulting under certain of its loan covenants with JPMorgan Chase ("Chase"), as agent for itself and Comerica Bank ("Comerica", and together with Chase, "Lenders");

**WHEREAS,** Company has been pursuing various strategies to restructure its operations to maximize the value of its Business, including seeking the potential sales of substantially all of its assets on a going concern basis with the assistance of an investment banker, the wind-down of other operations and the liquidating of certain other assets (the "Restructuring");

**WHEREAS,** the Restructuring efforts have resulted in the Company being presented with an offer for the purchase of certain of Company's assets through a chapter 11 bankruptcy proceeding sale process (the "Intended Sale");

**WHEREAS,** the Director, after due deliberation and consideration has determined in his good faith business judgment that the best course of action for the Company and its creditors is

**RESOLVED FURTHER,** by the Director of the Company that any and all agreements, instruments and documents previously executed, and acts and things previously done, to the extent consistent with these Resolutions and for the purpose of carrying out the purposes of these Resolutions are ratified, confirmed, and approved as the acts of this Company.

**IN WITNESS WHEREOF,** the undersigned, constituting the sole Director of the Company have hereunto set his hand as of the 11 day of October 2017.

By: William J. Beck
Director

{6741777:3}_v3

# **Exhibit A**
Amendment to Engagement Letter

{6741777:3}_v3



## MANAGEMENT SERVICES LLC

401 South Old Woodward Avenue, Suite 340
Birmingham, Michigan 48009
248.433.3100 | 248.433.3143 Fax
www.ConwayMacKenzie.com

October __, 2017

*Private & Confidential*
*Via E-mail*

BillNat Corporation
Attn: Mr. Jeffrey K. Tischler, CRO34450 Glendale Street
Livonia, Michigan 48150

> **Re:** *Amended Engagement of Conway MacKenzie Management Services, LLC. to Provide Interim Management and Restructuring Services to BillNat Corporation*

Dear Mr. Beck:

This letter and the attached Schedules (the "Agreement") govern the engagement by BillNat Corporation (the "Company") of Conway MacKenzie Management Services, LLC ("CMS") upon the commencement of a bankruptcy proceeding by the Company (the "Bankruptcy"). This Agreement shall modifies, amends and restates that certain Engagement Letter dated May 23, 2016 (the "Engagement Letter") as it pertains to the Company, provided however that the Services will not be performed in accordance with this Agreement until satisfaction of the Officer Conditions as defined below. To the extent there is any conflict between the Engagement Letter and this Agreement, this Agreement shall control. For the sake of clarity, the Engagement Letter has been: (a) superseded as to Frank W. Kerr Company ("Kerr") by the terms of employment of CMS in a the bankruptcy proceeding in which Kerr is the debtor, and (b) the services of CMS to Novixus, LLC ("Novixus") have concluded..

## Scope of Engagement

Based upon confidential discussions with you, CMS will provide the Company the personnel identified on Schedule I (the "Temporary Staff") for the positions, titles, pay rates, duties and other descriptions set forth on Schedule I (the "Services"). Temporary Staff who are officers ("Temporary Staff Officers") shall report to the Company's Board of Directors. In addition to the duties listed on Schedule I, the Temporary Staff will perform the tasks listed on Schedule II.

If the tasks require, Temporary Staff may use other CMS professionals who would also become Temporary Staff. However, we will not add Temporary Staff without your concurrence that the additional resources are required and do not duplicate the activities of others.

### Officer Conditions

The Temporary Staff Officers listed on Schedule I will not be officers of the Company once the Bankruptcy is filed until (a) CMS receives duly authorized consent resolutions of the Board of Directors of the Company evidencing the officer appointments of Temporary Staff Officers ("Resolutions") during the Bankruptcy; and (b) CMS determines that the Company has director and officer liability insurance ("D&O Insurance") in an amount and with coverage reasonably acceptable to CMS particularly given the Bankruptcy; (c) CMS confirms that each Temporary Staff Officer is covered by the Company's D&O Insurance policy; (d) CMS confirms that there are no claims against the D&O Insurance policy that would render the amount of the policy unacceptable to CMS; and (e) the Bankruptcy Court enters an order, in form and substance acceptable to CMS, authorizing the Company's continued employment of CMS on the terms and conditions set forth in this letter ((a) through (e), collectively, the "Officer Conditions"). The Company will use its best efforts to satisfy the Officer Conditions no later than 25 days after the commencement of the Bankruptcy..

### Engagement Fees

CMS will bill fees for the Services weekly at the rates set forth on Schedule I. In addition to the fees on Schedule I, the Company shall pay directly or reimburse CMS upon receipt of weekly billings, for all reasonable out-of-pocket expenses incurred in connection with this assignment such as travel, lodging, postage and actual telephone and facsimile charges.

Third party charges such as travel, meals and delivery services will be billed without surcharge.] For the avoidance of doubt, in the event of a bankruptcy proceeding, fees will include any costs and expenses incurred by CM in connection by any process to obtain or defend its fees and expenses.

Payment is due upon receipt of invoices via wire transfer of U.S. funds in accordance with the accompanying instructions.

### Retainer

Pursuant to the terms of the Engagement Letter dated May 23, 2016 CMS is holding a retainer in the amount of $150,000(the "Retainer"), of which $75,000 is applicable to the Company.

The Retainer will be applied as follows:

(A)  immediately prior to the filing of the Bankruptcy, CMS will apply the Retainer to all amounts due; provided that amounts drawn against the Retainer may include an estimate of fees and expenses incurred by CMS but not billed prior to the filing date. After the bankruptcy filing, CMS shall true-up the estimate of fees and expenses to actual fees and expenses incurred pre-petition and the Retainer balance will be adjusted accordingly. Any fees and expenses incurred which exceed the Retainer will be owed and paid as allowed by the bankruptcy court. The excess Retainer, if any, will be held by CMS and applied to any post-petition fees and expenses that are allowed by the bankruptcy court. If no such fees are allowed by the bankruptcy court, the excess Retainer will be refunded to the Company, without interest, at the end of the engagement, or

{6753521:3}

(B)     if the Company does not commence the Bankruptcy, the Retainer will be applied to CMS's invoices as they are issued. Payments on invoices will be used to replenish the Retainer. At the conclusion of the engagement any excess Retainer will be refunded to you, without interest, at that time.

We reserve the right to require that the Company increase our Retainer amount as we deem necessary.

### Access to Records/Personnel

You will provide the Temporary Staff access to books, records and reports of the Company, and Company personnel as needed to perform the Services. Access and disclosure will be full and complete. The books, records and reports of the Company will be of reasonable organization and quality. Temporary Staff Officers shall have appropriate access to the Company's management, lenders and other stakeholders.

### Reliance/Audit Issues

The Company is hiring the Temporary Staff to perform the duties on Schedules I and II. This engagement shall not constitute an audit, review or compilation, or any other type of financial statement reporting or consulting engagement that is subject to the rules of the AICPA, the SSCS or other such state and national professional bodies. Further, we may rely on the accuracy and validity of the data disclosed to us or supplied to us by the Company. Absent a written request from you, we will not update or confirm any data submitted to us.

### Confidentiality

CMS will keep confidential all non-public, confidential or proprietary information pertaining to the Company or its affiliates (the "Confidential Information") obtained from the Company during the performance of the Services and neither CMS nor the Temporary Staff will disclose any Confidential Information to any other person or entity, or use for any purpose other than as set forth in this Agreement This provision shall not prohibit the CM Entities or the Temporary Staff from disclosure pursuant to a valid subpoena or court order, or applicable law, but neither CMS nor such Temporary Staff shall incite or assist in securing, any such subpoena or court order. Temporary Staff shall immediately give notice of any such subpoena or court order they receive by fax or email transmission to the Company. Furthermore, CMS and the Temporary Staff may make reasonable disclosures of Confidential Information to perform the Services. In addition, CMS and the Temporary Staff will have the right to disclose to others in the normal course of business: (a) CMS's involvement with the Company; and (b) basic information about this engagement as necessary to clear conflicts.

Information includes data, plans, reports, schedules, drawings, accounts, records, calculations, specifications, flow sheets, computer programs, source or object codes, results, models, or any work product relating to the business of the Company, its subsidiaries, distributors, affiliates, vendors, customers, employees, contractors and consultants.

All information (written or oral) generated by the Temporary Staff in connection with this engagement is intended solely for the benefit and use of the Company limited to its Board of Directors and management in connection with this engagement. The Company agrees that no information shall be used for any other purpose or reproduced, disseminated, quoted or referred to with attribution to CMS at any time in any manner or for any purpose other than accomplishing the tasks referred to in this Agreement, without CMS's prior approval (which shall not be unreasonably withheld) except as required by law.

CMS's confidentiality obligations pursuant to this provision shall survive for two years after the conclusion of this Agreement.

## Deliverables

Upon payment of all amounts due to CMS in connection with this Agreement, and except as set forth below, all rights to final reports and other deliverables (the "Deliverables") that CMS develops specifically for the Company in connection with this Agreement shall be owned by the Company subject to the confidentiality provisions in this Agreement. CMS may retain copies of any of the Deliverables subject to the confidentiality provisions in this Agreement.

CMS shall retain sole and exclusive ownership of its work papers, methodologies, proprietary information, trade secrets, software, tools, templates, know-how, models and other intellectual property that CMS previously developed and used to create the Deliverables or that were created in connection with this Agreement (the "Proprietary Information"). If the Deliverables contain Proprietary Information, CMS grants the Company a non-exclusive, non-assignable license to use the Proprietary Information only in connection with the Deliverables and this Agreement.

## Disclosure of Pre-existing Relationships

To the best of our knowledge and except as set forth on Schedule II: (a) CMS, its employees, and affiliates (the "CM Entities"), do not have any financial interest or business connection with the Company other than as contemplated by this Agreement, and (b) there is no conflict of interest for us in providing the Services. The CM Entities: (a) have in the past and from time to time do represent the parties disclosed on Schedule II (A) in matters unrelated to the Company ("Unrelated Matters"); and (b) have in the past represented the parties disclosed on Schedule II (B) (the "Related Matters" and the parties, collectively with the parties disclosed on Schedule II (A), the "Disclosed Parties") in matters related to the Company (together with those on Schedule II (A), the "Disclosed Representations"). The CM Entities do not anticipate having any future involvement in the Related Matters pertaining to Novixus.

By signing this Agreement, the Company (1) waives any conflict of interest relating to performance of professional services by any of the CM Entities in connection with the Disclosed Representations, (2) consents to the continued performance of professional services by any of the CM Entities for the Disclosed Parties in connection with the Unrelated Matters, and (3) releases the CM Entities, their employees, officers and affiliates, of any claim or liability arising prior to the date of this Agreement, relating to the Disclosed Representations.

## Relationship of the Parties

{6753521:3}

The parties intend that CMS is an independent contractor to the Company. As an independent contractor, CMS will have exclusive charge of hiring and paying all compensation and benefits for the Temporary Staff. The Company will not pay the Temporary Staff or CMS any compensation or benefits, of any kind. CMS will be responsible for all employment, withholding, income and other taxes incurred in connection with the Temporary Staff. Temporary Staff will not be employees of the Company under this Agreement.

### No Representations or Warranties

None of the CM Entities have made any warranties or guarantees of any nature as to the success or satisfactory conclusion of this engagement or as to the economic, operational, financial or other results which may be obtained or experienced by the Company.

### Bankruptcy

If the Company commences the Bankruptcy:

(a) The Company shall (i) apply promptly to the bankruptcy court for approval of CMS's retention under the terms of this Agreement, *nunc pro tunc* to the date of the bankruptcy filing, (ii) provide CMS draft copies of all pleadings in connection with the same for approval, and (iii) use its best efforts to obtain bankruptcy court approval. CMS shall have no obligation to provide any Services under this Agreement unless and until CMS's retention under the terms of this Agreement is approved by a final order of the Bankruptcy court in form and substance acceptable to CMS; and

(b) In the event the Bankruptcy court approves CMS's retention by the Company pursuant to the application process described in this Section, the Company shall pay CMS's fees and expenses associated with any order (i) approving CMS's retention, and (ii) approving fees and expenses.

### Covenant Regarding Hiring of CMS Employees

The Company will notify CMS if it extends an offer of employment to any Temporary Staff. In recognition of the training, time, and other resources that the CM Entities invest in the development of their employees, in the building of relationships between clients and employees of the CM Entities, the loss of client billable time resulting from the transition of client files from a departing employee to another employee, and the difficulty of placing a monetary value on these investments by the CM Entities, the Company agrees that if it hires any Temporary Staff up to two years subsequent to the date of the final invoice rendered by CMS to the Company for this engagement, the Company will pay CMS a cash fee in the amount $1 million on or before the Company's hiring of such Temporary Staff. This agreement does not prohibit the Company from making general solicitations for employment or from soliciting for employment any individuals who have ceased to be employees or agents of the CM Entities prior and unrelated to such solicitation.

### Indemnification

The Company agrees to indemnify, hold harmless, and defend CMS and certain related entities and persons as set forth on the attached Schedule III. In addition, the Company shall indemnify the

Temporary Staff Officers on the most favorable basis provided by the Company to its officers and directors including under any charter, by-laws, contract or otherwise.**Limitation of Liability**

CMS or any of the CM Entities or any of their partners, employees, agents, officers, directors, affiliates, subsidiaries, shareholders, successors or assigns (the "CM Parties") shall not be liable to the Company, or any party asserting claims on behalf of the Company or otherwise, including, without limitation, any of the Company's equity holders, for any Loss except for direct damages found in a Final Judgment (as such terms are defined in Schedule III) to be the direct result of CMS's gross negligence or willful misconduct. The CM Parties will in no case be liable for special, incidental, consequential, punitive or indirect loss or damage, including lost profits or lost savings, whether or not foreseeable or CMS has been advised of the possibility of such Loss. The collective liability of the CM Parties if any, in relation to this Agreement shall be limited in amount to the fees paid to CMS by the Company for the Services.

**D&O Insurance**

At the request of CMS, the Company shall provide CMS with a copy of its current D&O Insurance policy, a certificate of insurance evidencing it is in full force and effect, and any other documents CMS may reasonably request evidencing such coverage. The Company shall maintain D&O coverage for the Temporary Staff Officers for so long as claims can be made against them on account of their role as officers of the Company. The Company disclaims any right to distribution on behalf of the Temporary Staff Officers. In the event that the Company does not maintain satisfactory insurance coverage at any point during this engagement, CMS may purchase a separate D&O policy that will cover Temporary Staff Officers only. The cost of this policy shall be billed to the Company as an out of pocket expense.

**Termination**

Either the Company or CMS may terminate this engagement at any time and for any reason provided that, if terminated by either party, all professional fees and expenses due, both billed and unbilled, up through the time and date of termination shall (i) become immediately due and payable and, (ii) at the option of CMS, any unpaid amounts be setoff against the Retainer with any balance due to either the Company or to CMS paid immediately thereafter. In addition, any performance based fee shall be due and payable up to 12 months after the termination of this Agreement in the event that the metrics on which the fee is based are achieved within that 12-month period. In addition, the covenant regarding hiring of CMS employees, and the confidentiality, indemnification, limitation of liability, marketing and dispute resolution provisions of this Agreement shall survive termination of this Agreement.

**Dispute Resolution**

In the event of a dispute, each of the parties agrees to submit to binding arbitration exclusively to resolve any disputes which may arise between them (and their successors, assigns, employees, officers, directors, affiliates, subsidiaries, or shareholders) related to this Agreement or otherwise arising between the parties. Prior to initiating arbitration, the parties shall first meet face-to-face to affect a resolution of their differences. Any differences which the parties are unable to resolve in a face-to-face meeting, shall be heard and finally settled in Oakland County, Michigan, or in any other location mutually agreed upon by the parties, by binding arbitration in accordance with the Commercial Arbitration Rules of the

American Arbitration Association. The arbitration shall be initiated in the Southfield, Michigan, office of the American Arbitration Association. Any award entered in any such arbitration shall be final, binding, and may be entered and enforced in any court of competent jurisdiction. Notwithstanding the foregoing, in the event the Company commences the Bankruptcy, all disputes under this Agreement shall be brought in the bankruptcy court handling such Bankruptcy.

## Marketing

CMS is hereby authorized, at its own expense to place a customary "tombstone" advertisement or similar announcement in such form and in such media as CMS deems appropriate.

## Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without regard to such state's rules concerning conflict of laws.

## Severability

If any term, provision or portion of this Agreement shall be determined to be invalid, void or unenforceable, the remainder of the terms, provisions and portions of this Agreement letter shall remain in full force and effect.

## Complete Understanding

This Agreement sets forth the entire understanding of the parties concerning the matters contained in this Agreement and supersedes all prior agreements, arrangements and communications, whether oral or written, with respect to the matters contained herein.

## Modification

This Agreement may not be altered, modified or changed in any manner except by a writing signed by the parties.

## Notices

All notices required or permitted to be delivered under this Agreement shall be sent, if to CMS, to the address set forth at the head of this letter, to the attention of the Company's Chief Executive Officer, and if to the Company, to the address set forth above to the attention of the Company's Counsel, McDonald Hopkins PLC, attention Stephen M. Gross, Esq., 39533 Woodward Ave., Ste. 318, Bloomfield Hills, MI 48304 or to such other name or address as may be given in writing to the other party. All notices under this Agreement shall be sufficient if delivered by facsimile or overnight mail. Any notice shall be deemed to be given only upon actual receipt.

<u>**Acceptance of Terms and Conditions**</u>

If you agree with the terms of this Agreement, please sign and date in the space provided below and return via facsimile and via overnight mail one executed original of this letter. In addition, please execute a wire transfer for the Retainer, in accordance with the accompanying instructions. This Agreement shall not be effective until receipt of the signed Agreement and the Retainer, at which time we will commence work.

We appreciate this opportunity to be of assistance to the Company and look forward to working with you in this important matter.

Very truly yours,

**CONWAY MACKENZIE MANAGEMENT
SERVICES, LLC.**

Steven R. Wybo
Senior Managing Director

*Above Terms Agreed to and Accepted:*

**BillNat Corporation, on its own behalf, and on behalf of its direct and indirect subsidiaries**

By: _____          Date: _____

Name:  Jeffrey K. Tischler

Its (with respect to each entity):  Chief Restructuring Officer

{Ratified by:

_____

Board of Directors signatures here.]

_____

# WIRE TRANSFER INSTRUCTIONS
## TO CONWAY MACKENZIE MANAGEMENT SERVICES, LLC.

**Federal Tax ID:  20-0217399**

**Retainer:**

> Comerica Bank
> 188 North Old Woodward
> Birmingham, MI 48009
> ABA Routing #072000096
> (248) 644-2601
>
> Conway MacKenzie Management Services, LLC.
> Account # 1852-66523-9

**Any Billings Thereafter:**

> Comerica Bank
> 188 North Old Woodward
> Birmingham, MI 48009
> ABA Routing #072000096
> (248) 644-2601
>
> Conway MacKenzie Management Services, LLC.
> Account # 1852-66527-0

{6753521:3}

## SCHEDULE I

| Name | Description of Role | Hourly Rate | Duties, including those attendant to any office |
|------|--------------------|-------------|-------------------------------------------------|
| Jeffrey K. Tischler | Chief Restructuring Officer | $535 | Schedule 1 (A) |
| Matthew J. Davidson | CRO Support Staff | $525 | Schedule 1 (A) |
| Michael C. Walsh | CRO Support Staff | $390 | Schedule 1 (A) |

The parties agree that Exhibit A can be amended to add or delete staff. The weekly billing shall be treated by the parties as such amendments.

[In addition to the duties set forth above, duties will include those set forth on Schedule I(A)]

Our fees of our other personnel that may become Temporary Staff for the Company from time to time under this Agreement will be based on the hours charged at our hourly rates, as follows:

| | |
|---|---|
| Managing and Senior Managing Directors | $425 - $625 |
| Senior Associates and Directors | $345 - $420 |

Hourly rates are subject to periodic adjustment.

{6753521:3}

## SCHEDULE I(A)

### Additional Tasks/Duties

#### Financial and Cash Management Tasks

1. Oversee all cash and liquidity management;
2. Prepare 13-week cash flows that are integrated with the [Company's business plan, bottoms up plan] that identifies future liquidity/financing alternatives;
3. Lead all treasury functions including control over all disbursements of Company monies, assets or other value; debt monitoring and compliance; cash management and banking relationships;
4. Hiring and firing of personnel;
5. Assist with or accounting functions including payroll, tax and the books and records of the Company;
6. Assist with or financial management functions including preparation of and review of monthly financial statements and various financial reporting packages;
7. Convert the Company's cash forecast to a traditional weekly cash forecast format (which would foster better forecast v. actual reporting;
8. Upon request, [provide bank with cash forecast updates with variance analysis for previous week(s);
9. Provide ideas and recommendations for improvements to short term liquidity outlook;

#### Operational Tasks

10. Identify future operational improvements, fixed cost reductions, and future restructuring requirements as needed;
11. Review operational improvement actions taken in current and prior years and understand the run-rate benefits;
12. Evaluate unprofitable stores and provide recommendations;
13. Provide the Board of Directors with a thorough understanding of the issues and challenges faced by the Company and seek approval of the Board of Directors as may be necessary for certain actions from time to time;
14. Analyze the financial impact of the issues on effecting the Company's long term viability, including on a store by store basis as desired;
15. Provide strategy alternatives to optimize the Company's outcome;
16. Determine and analyze solutions to minimize risk and seek recoveries through financial and other measures;

#### Business Plans and Transactions

17. Where appropriate, lead communications and negotiations with other constituents critical to the successful execution of the Company's planned sale transaction;
18. Evaluate various liquidation values of the Company's assets under different scenarios;
19. Work with the Company, as appropriate, and its professionals to assist with any divestitures, including without limitation working with the Company's retained investment

banking professionals and legal counsel to review any indications of interest for any going concern sale and to leading the efforts effectuate such a sale inside or outside of a chapter 11 bankruptcy proceeding.;

## Bankruptcy related services

20. Evaluate the short-term Company-prepared cash flows and financing requirements of the Company as it relates to the Company's planned Chapter 11 proceedings;
21. Lead] the Company in its planned Chapter 11 proceedings, including preparation and oversight of its financial statements and schedules related to the bankruptcy process, monthly operating reports, first day pleadings, and other information required in the bankruptcy;
22. Assist the Company in obtaining court approval for use of cash collateral or other financing including developing forecasts and information;
23. Assist the Company with respect to its bankruptcy-related claims management and reconciliation process;
24. Assist the Company in development of a plan of reorganization, including preparation of a liquidation analysis, historical financial data and projections;
25. Assist management, where appropriate, in communications and negotiations with other constituents critical to the successful execution of the Company's bankruptcy proceedings;
26. Work with the Company, as appropriate, and its retained investment banking professionals, to assess any offer(s) made pursuant to bankruptcy court-approved sale procedures;

## General

27. Assist the Company in communications with key constituents, as requested, including lenders, equity holders, customers, and/or other stakeholders;
28. Other services as you deem appropriate and as agreed to by CMS.
29. Other services as directed by the Board nd as agreed to by CMS

## SCHEDULE II

**A.** **Current and Former Representations in Unrelated Matters**



**B.** **Current and Former Representations in Related Matters**

    a.   CMS personnel currently serve as CRO and CRO Support Staff to Frank W. Kerr, parent company to the Company

    b.   CMS personnel previously served as CRO and CRO Support Staff to Novixus, LLC, an affiliated entity to the Company, which has now been liquidated. As a result, such services have concluded.

## **SCHEDULE III**

If CMS or any of the CM Entities or any of their, partners, officers, directors, shareholders, agents, employees or controlling persons (collectively, the "Indemnified Persons" and each, an "Indemnified Person") becomes involved in any capacity in any claim, action, proceeding (including any objection to or proceeding involving an Indemnified Person's fees or expenses) or investigation (each an "Action", or collectively, "Actions") brought by or against any person or entity, in any way related to this Agreement, the Company periodically will advance to the Indemnified Person amounts necessary to pay his/her reasonable out-of-pocket legal and other expenses (including the cost of any investigation and preparation) incurred in connection with the Actions; provided, however, that if it is finally found (in a non-appealable judgment) by a court of competent jurisdiction (a "Final Judgment") that any loss, claim, judgment, damage or liability (a "Loss", or collectively, "Losses")) of an Indemnified Person has resulted primarily from the gross negligence or willful misconduct of such Indemnified Person in performing the Services, such Indemnified Person shall repay such portion of the advanced amounts that is attributable to expenses incurred in relation to the act or omission of such Indemnified Person that is the subject of such Final Judgment. The Company also will indemnify and hold the Indemnified Persons harmless from and against any Losses to which such Indemnified Person may become subject, that is related to in any way this Agreement, without regard to the exclusive or contributory negligence of any Indemnified Person, except to the extent that it is finally found in a Final Judgment that a Loss resulted primarily from the gross negligence or willful misconduct of the Indemnified Person in performing the Services.

Upon receipt by an Indemnified Person of actual notice of an Action covered by this indemnity, such Indemnified Person will use its best efforts to promptly notify the Company in writing; provided that failure to so notify the Company shall not relieve the Company from any obligation to indemnify the Indemnified Person under this indemnity. The Company shall, if requested by the Indemnified Person, assume the defense of any such Action, including the employment of counsel reasonably satisfactory to the Indemnified Person. An Indemnified Person may retain separate counsel to represent it in the defense of any Action, which shall be at the expense of the Company if (i) the Indemnified Person does not request the Company to assume the defense of any such Action or the Company does not assume the defense of the Action within a reasonable period of time after being requested to assume the defense of the Action, or (ii) the Indemnified Person is advised by counsel in writing that there is an actual or potential conflict in the Company's and the Indemnified Person's respective interests or additional defenses are available to the Indemnified Person, which makes representation by the same counsel inappropriate; provided that in no event shall the Company be obligated to pay expenses for more than one counsel in any one jurisdiction for all Indemnified Persons in connection with any Action.

If for any reason the foregoing indemnification is unavailable to an Indemnified Person or is insufficient to hold the Indemnified Person harmless, then the Company shall contribute to the amount paid or payable by the Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect (i) the relative economic benefits to the Company and its equity holders, on the one hand, and to the Indemnified Persons, on the other hand, of the matters covered by this engagement; or (ii) if the allocation provided by the immediately preceding clause is not permitted by applicable law, not only such relative economic benefits but also the relative fault of the Company, on the one hand, and the

{6753521:3}

Indemnified Persons, on the other hand, with respect to such Loss and any other relevant equitable considerations. For purposes of this paragraph, the relative economic benefits to the Indemnified Persons of the matters contemplated in this Agreement, shall be deemed to be the fees paid or to be paid to CMS under this Agreement; provided, however, that, to the extent permitted by applicable law, in no event shall the Indemnified Persons be required to contribute an aggregate amount in excess of the aggregate fees actually paid to CMS under this Agreement.

The reimbursement, indemnity and contribution obligations of the Company in this Schedule III shall be in addition to any liability which the Company may otherwise have to the Indemnified Person and shall be binding upon and inure to the benefit of any successors, heirs and personal representatives of the Company and the Indemnified Persons.

The Company shall not be required to indemnify an Indemnified Person for any amount paid or payable by the Indemnified Person in the settlement of any Action without the consent of the Company, which consent shall not be unreasonably withheld. Prior to entering into any agreement or arrangement which may affect this indemnity and that does not provide for the assumption of the obligations of the Company set forth in this Schedule III, the Company will notify CMS in writing, and if requested by CMS, shall arrange alternative means which are reasonably satisfactory to CMS of providing for the obligations of the Company set forth in this Schedule III.

{6753521:3}