# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

IN RE:

BILLNAT CORPORATION        CASE NO: 17-54357

                             CHAPTER 11

          DEBTOR.            HON.

---

## DEBTOR'S FIRST DAY MOTION FOR ORDER AUTHORIZING LIMITED POST-PETITION FINANCING FOR THE PURCHASE OF GOODS; USE OF CASH COLLATERAL; AND GRANTING ADEQUATE PROTECTION ON AN INTERIM BASIS PENDING FINAL HEARING

NOW COMES Billnat Corporation ("**Debtor**"), by and through its counsel, McDonald Hopkins PLC, and for it Motion for an Order Authorizing Limited Post Petition Financing, Use of Cash Collateral and Granting Adequate Protection on an Interim Basis Pending Final Hearing (the "**Motion**") states:

### JURISDICTION

1.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings and the Motion in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 363, and 364 of the Bankruptcy Code, Bankruptcy Rules 2002 and 6004, and Local Rules 4001-2 and 4001-4.

## BACKGROUND

3.     On October 13, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is continuing in possession of its property and is operating and managing its businesses as a debtor in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.     No official committee of unsecured creditors has been appointed in this chapter 11 case.

5.     The Debtor is in the business of operating twenty retail pharmacies from leased facilities in Southeastern Michigan under the name "Sav-On Drugs". The Debtor's corporate headquarters is located in leased facilities in Livonia, Michigan.

6.     The Debtor is solely owned by the Frank W. Kerr Company ("**Kerr**"), which was engaged in the business of selling wholesale pharmaceutical products to retail pharmacies, including the Debtor, and recently confirmed its Plan of Liquidation (the "**Kerr Plan**") in Case No. 16-51724 currently pending before this

Court (the "**Kerr Bankruptcy**") and Kerr's assets will be liquidated and distributed pursuant the terms of the Kerr Plan.

7.      In May 2016, the Debtor and Kerr engaged Conway MacKenzie Management Services, LLC ("**CM**") to assist them with cash flow issues and the Debtor and Kerr soon thereafter advised the Lenders (as defined below) that the Debtor and Kerr were in default under the terms of the Credit Agreement (as defined below).

8.      On June 2, 2016, the Debtor and Kerr appointed Jeffrey K. Tischler of CM as their Chief Restructuring Officer ("**CRO**") and commenced a wind-down of Kerr's operations, and embarked on a sale of the Debtor as a going concern business, to maximize the values of their assets for the benefit of their respective creditors .

9.      As part of the strategy to maximize value for all of its creditors, after interviewing several investment bankers, the Debtor with the advice and consent of Lenders and approval from the then Board of Directors or Kerr and the Debtor, retained SSG Advisors, LLC ("**SSG**") as its investment banker on June 14, 2016 to market its assets and seek a buyer for such assets.

10.     As a result of this sale process, the Debtor entered into an Asset Purchase Agreement (the "**Stalking Horse APA**") with Woodward CVS, LLC, a subsidiary of CVS Pharmacy, Inc. ("**CVS**"), which sale is the subject of a *Motion*

*for an Order (I) Authorizing the Debtor to Enter into Agreement for Sale of Substantially all of the Debtor's Assets with Successful Bidder at Auction; (II) Approving the Asset Purchase agreement between the Debtor and Woodward Detroit CVS, LLC; (III) Authorizing the Sale of Substantially all of the Debtor's Assets Free and Clear of all Liens, Claims, Interests and Encumbrances and Transferring Liens to Proceeds thereof; (IV) Authorizing and Approving the Assumption and Assignment of Certain of the Debtor's Executory Contracts and Unexpired Leases; and (V) Granting Related Relief* (the "**Sale Motion**"),and *Debtor's Emergency Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 363 and 365, Bankruptcy Rules 2002 and 6004, and Local Rules 6004-1 and 9014-1 (a) Establishing Bidding Procedures for the Auction Sale of Substantially all of Debtor's Assets Free and Clear of Liens, Claims and Encumbrances and Transferring Liens to Proceeds; (B) Scheduling an Auction and a Sale Hearing to Consider Approval of Sale; (C) Establishing Procedures for the Assumption and Assignment of Executory Contracts; (D) Approving the Form of Asset Purchase Agreement, Form and Manner of the Auction Notice, the Form of the Notice to Non-Debtor Co-parties to Executory Contracts, and the Notice of the Sale Hearing* (the "**Bid Procedures Motion**" and together with the Sale Motion, the "**Sale Motions**") being filed contemporaneously herewith.

## SECURED OBLIGATIONS TO CARDINAL

11.     Starting in early 2016, because of its financial difficulties, Kerr became inconsistent in its ability to supply Debtor with pharmaceutical and other products.  As a result, the Debtor sought to have Cardinal Health 110, LLC ("**Cardinal**") become its primary vendor of pharmaceutical products utilizing a Prime Vendor Agreement previously executed by Cardinal and Debtor on December 1, 2012 and later superseded by a Prime Vendor Agreement, Contract No. 81875 effective August 1, 2016 (the "**Cardinal Prime Vendor Agreement**") under which Cardinal agreed to provide the Debtor with a revolving inventory line of credit in the aggregate amount of $3,000,000 to be used to fund purchases of inventory by the Debtor from Cardinal (the "**Cardinal Line of Credit**"), which ensured the Debtor a supply of necessary products at favorable prices as Kerr ultimately ceased operating and no longer able to supply Debtor.

12.     Because of the financial condition of Kerr and the Debtor, Cardinal was unwilling to supply products to Debtor pursuant to the Cardinal Prime Vendor Agreement without receiving a perfected first priority security interest in the Debtor's assets to secure payment for goods shipped to Debtor. Accordingly, on June 24, 2016, the Debtor entered into a certain security agreement granting Cardinal liens on all of Debtor's assets, subject to the liens of Lenders, to secure all sums owed by Debtor for goods supplied by Cardinal (the "**Cardinal Security Agreement**").  A UCC-1 Financing Statement was filed by Cardinal on June 27,

2016 with the Michigan Deaprtment of State, No. 2016089582-2 to perfect the security interests granted in the Cardinal Security Agreement (the "**Cardinal Pre-Petition Liens**").

13.     On July 1, 2016, Cardinal and the Lenders entered into a certain Intercreditor Agreement pursuant to which Lenders subordinated their liens (as described below) to Cardinal's liens to the extent of the Cardinal Line of Credit for goods shipped to Debtor (the "**Cardinal Indebtedness**") provided that Cardinal (a) continued to supply products to Debtor on credit pursuant to the Cardinal Prime Vendor Agreement; and (b) all of the Debtor's assets were sold as a going business or sales of the assets of its individual locations were sold as going businesses. (the "**Intercreditor Agreement**" and together with the Cardinal Prime Vendor Agreement and the Cardinal Security Agreement, the "**Cardinal Documents**" as amended and extended).

14.     On the Petition Date, the amount of the Cardinal Indebtedness was approximately $1,600,000 plus accrued but unpaid interest, attorneys' fees, late fees, costs, expenses and other charges of the kind provided for by the Cardinal Documents as of such date, less any and all credits, rebates, and payment for statement credits and rebates for goods purchased under the Cardinal Documents and Cardinal's vendor policies, including but not limited to the RBC promotional pricing and rebate programs as of such date.

15.     The Cardinal Indebtedness is due and payable in full for Cardinal's delivery of inventory to the Debtor pursuant to the Prime Vendor Agreement that the Debtor has not yet paid Cardinal for, and the Cardinal Indebtedness constitutes a valid and binding obligation of the Debtor to Cardinal, without offset, recoupment, counterclaim, deduction, defense, or claim, in law or equity, of any nature, but subject to the Lenders' rights as set forth in the Intercreditor Agreement.

16.     Pursuant to the Cardinal Security Agreement, to secure the Cardinal Indebtedness, Cardinal holds a properly perfected security interest (subject to the Lenders' security interest in the event that a sale of the Debtor's assets does not occur as set forth in the Intercreditor Agreement or Cardinal fails to supply inventory to the Debtor pursuant to the Cardinal Documents) in all of the Debtor's tangible and intangible assets (the "**Cardinal Collateral**").


**SECURED OBLIGATIONS TO LENDERS**


17.     The Debtor is indebted to JPMorgan Chase Bank, N.A., as Administrative Agent ("**Agent**", and its capacity as a Lender, ("**Chase**") for itself and Comerica Bank ("**Comerica**", and with Chase, the "**Lenders**") with respect to

a revolving line of credit in a principal amount not to exceed $60,000,000 (the

"**Line of Credit**") under the terms of the following documents and arrangements:

> 1) Administrative Agent, Lenders and Kerr as Borrower, among others, are parties to a Credit Agreement dated as of July 19, 2013, as amended by a First Amendment to Credit Agreement dated as of July 31, 2014, A Second Amendment to Credit Agreement dated as of July 31, 2015, a Third Amendment to Credit Agreement dated as of September 30, 2015, a Fourth Amendment to Credit Agreement dated as of October 30, 2015, a Joinder Agreement dated as of October 30, 2015, and a Joined Agreement dated on or about May 27, 2016 (as amended, the "**Credit Agreement**").

> 2) in the Credit Agreement, the Debtor guarantied all of Kerr's obligations to Lenders; and

> 3) the Debtors obligations to Agent and Lenders under the Credit Agreement are secured by the Debtor's personal property pursuant to a Pledge and Security Agreement by the Debtor dated September 30, 2015 (the "**Debtor's Guarantor Security Agreement**").

18.    The Credit Agreement provisions related to the Debtor's guaranty in the Credit Agreement are called the "**Debtor's Guaranty**".    The Debtor's Guaranty and all other documents and agreements delivered by the Debtor are collectively called the "**Debtor's Guarantor Loan Documents**".

19.    The Credit Agreement, the Debtor's Guarantor Loan Documents, the Debtor's Guarantor Security Agreement, and all other present and future loan documents delivered in connection with these documents, including all documents delivered in connection with these documents, including all documents delivered in

connected with the Order (defined below), are collectively called the "**Loan Documents**". Capitalized terms used but not defined in the Order have the same meanings as in the Loan Documents.

20. On the Petition Date, Kerr owed approximately $41,511,824 in principal (the **Principal Debt**") to Lenders under the Credit Agreement. Pursuant to the Debtor's Guaranty , the Debtor guarantied the indebtedness owed to the Lenders by Kerr. The Debtor acknowledges and agrees that it is indebted to the Lenders for the Principal debt as of the Petition Date. Debtor also owed Agent and lenders other Obligations. "**Obligations**" means Debtor's present and future obligations and liabilities to Agent and Lenders, including:

(1) The Principal Debt.

(2) All other principal and, if it is determined that Lenders are oversecured, interest now or in the future owed by Debtor to Agent or Lenders.

(3) All Secured Obligations (as defined in the Credit Agreement).

(4) All other indebtedness and liabilities now or in the future owed by Debtor to Agent or Lenders, however created, incurred, evidenced, acquired, or arising, whether direct or indirect, primary, secondary, fixed or contingent, matured or unmatured, joint, several, or joint and several, and whether for principal, interest, overdraft indebtedness, lease obligations, credit card indebtedness, purchasing card obligations, reimbursement obligations, indemnity obligations, or otherwise.

(5) Those arising under guaranty agreements—including the Guarantor Loan Documents.

(6)    Fees, costs, expenses, attorneys' fees, and consultant fees if it is determined that Lenders are oversecured.

(7)    Any other obligations arising in connection with the Loan Documents.

21.    As of the Petition Date, Debtor is indebted to the Lenders in the principal amount of approximately $41,511,824, plus accrued but unpaid interest, attorneys' fees, consultant fees, late fees, costs, expenses and other charges of the kind provided for by the Loan Documents as of such date (collectively the "**Pre-Petition Indebtedness**"), (i) as of the Petition Date, the Pre-Petition Indebtedness has been accelaerated and is immediately due and payable in full as a result of certain defaults by the Debtor under the terms of the Loan Documents, and (ii) the Pre-Petition Indebtedness constitutes a valid and binding obligation of the Debtor to the Lenders without offset, recoupment, counterclaim, deduction, defenses, or claim, in law or equity, of any nature or kind.

22.    Under the Loan Documents, to secure the Pre-Petition Indebtedness, the Agent holds a properly perfected first priority lien and security interest (except to the extent it is subordinated to the Cardinal Indebtedness pursuant to the Cardinal Documents and any Pre-Petition Liens existing on the Petition Date, which are senior to the Agent's liens as expressly permitted under the terms of the Loan Documents, and which are not subject to avoidance or other subordination

pursuant to the Code or applicable non-bankruptcy law ) in all of the Debtor's present and future accounts, general intangibles, documents, instruments, chattel paper, inventory, equipment, fixtures, deposit accounts, investment property, and all products and proceeds thereof (herein the "**Pre-Petition Collateral**"). For purposes of this Motion, the term "**proceeds**" of any Pre-Petition Collateral means proceeds of such collateral as defined in the Uniform Commercial Code as well as (i) any and all proceeds of any insurance, indemnity or warranty or guaranty payable to the Debtor from time to time with respect to any such collateral (ii) any and all payments (in any form whatsoever) made or due and payable to the Debtor in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of such collateral by any governmental body, authority, bureau or agency (or any person under color of governmental authority) and (iii) any other payments, dividends, interest or other distributions on or in respect of any such collateral.

23.     The Agent's liens in the Pre-Petition Collateral are first in priority, properly perfected and recorded, and are unavoidable and indefeasible in this case or otherwise, except to the extent that the Agent's liens are subordinated to the Cardinal Indtedness pursuant to the Cardinal Agreement, and are subject any pre-petition liens existing on the Petition Date which are senior to the Agent's liens as expressly permitted under the terms of the Loan Documents, and which are not

subject to avoidance or other subordination pursuant to the Code or applicable non-bankruptcy law.

## Debtor's Assets Securing the Obligations

24.     Pursuant to the L.B.R. 4001-2(a) the Debtor asserts that the estimated going concern value of the Pre-Petition Collateral securing the Obligations is as follows:

|  | High | Low |
|---|---|---|
| Sale Value Per Stalking Horse APA | $19,600,000 | $13,600,000 |
| Excluded Assets | | |
| Cash on Hand | 1,300,000 | 1,300,000 |
| Accounts Receivable Balance | 4,200,000 | 3,300,000 |
| Huntsman Accounts Receivable Balance | 150,000 | 100,000 |
| Other Excluded Assets | 1,500,000 | 1,000,000 |
| **Total Collateral Value** | **$26,750,000** | **$19,300,000** |
| Less: Cardinal Secured Indebtedness: | (1,600,000) | (1,600,000) |
| Value of Collateral Securing Obligations[1]: | $25,150,000 | $17,700,000 |

25.     Accordingly, the Debtor estimates that the value of the Pre-Petition Collateral is less than the Pre-Petition Indebtedness, and states that based upon its projections the value of the Pre-Petition Collateral is susceptible, with the passage of time, to diminution in value.

---

[1] Prior to the administrative costs of this case.

26.     For the purposes of this Motion, the term "**Cash Collateral**" shall mean and include but not be limited to all cash, checks, refunds (including tax refunds), negotiable instruments, documents of title, securities, deposit accounts and other cash equivalents which are now or may hereafter come into the possession, custody or control of the Debtor, including the cash proceeds of any pre-petition or post-petition sales of the Pre-Petition Collateral, and the term "**Indebtedness**" shall mean the Pre-Petition Indebtedness and any indebtedness of the Debtor to the Lenders arising after the Petition Date, including without limitation, any indebtedness arising under the terms of this Motion.

27.     Other parties may assert that they hold liens and security interests in property of the Debtor, including without limitation, the Cash Collateral. The Debtor asserts that, with the exception the Cardinal Indebtedness entitled to priority over the Lenders pursuant to the Cardinal Documents, any such liens and security interests are junior in priority to the liens in favor of the Agent.

## NECESSITY AND TERMS OF PROPOSED RELIEF

28.     The Debtor asserts that it requires the use of Cash Collateral and the continuation of the Line of Credit to enable it to (i) acquire inventory products from Cardinal pursuant to the Cardinal Documents, (ii) to continue operating its business, (iii) to enable it to consummate the anticipated going concern sale, and

(iv) to avoid the irreparable harm that could result from failing to do any of the foregoing.

29.     Lenders are willing to consent to the use of Cash Collateral to permit the Debtor to fund operations to achieve the sale, as well as a Post Petition continuation of Line of Credit pursuant to the Cardinal Documents; and Cardinal is willing to consent to the use of Cash Collateral and to continue providing inventory under the Line of Credit  pursuant to the Cardinal Documents, subject to the terms and conditions set forth in the Order.

30.     The Lenders are entitled, pursuant to sections 361, 362(d) and 363 of the Code, to adequate protection of their respective interests in the Pre-Petition Collateral, and the Cash Collateral, including to the extent of any diminution in value of the Pre-Petition Collateral resulting from the use, sale or lease thereof and the imposition of the automatic stay.

31.     The Debtor has agreed to provide adequate protection to the Lenders on the terms and conditions of the Order as set forth below, and it believes that the provision of such adequate protection is in the best interest of the Debtor and its estate.

## ADEQUATE PROTECTION

32.     As adequate protection for, and to secure an amount of the Pre-Petition Indebtedness equal to the sum of the aggregate diminution subsequent to

the Petition Date in the value of the Pre-Petition by (i) depreciation, use, sale, loss, decline in market price or otherwise, (ii) the Interim Cash Collateral Amount, and (iii) the Post Interim Cash Collateral Amount, under the proposed *Order Authorizing Limited Post Petition Financing for the Purchase of Goods, Use of Cash Collateral and Granting Adequate Protection on an Interim Basis Pending Final Hearing* attached as **Exhibit A** (the "**Order**"), the Agent is granted a lien (the "**Post-Petition Lien**") in all of the Debtor' right, title and interest in and to all of its post-petition goods, property, assets, causes of action, and interests in property, whether real (including the Property) or personal, tangible or intangible, now existing and/or owned and hereafter arising and/or acquired and wherever located, including all property of the Debtor's estate as defined in Section 541 of the Code, and all property arising, created or acquired by the Debtor after the Petition Date, including without limitation certain proceeds to be received from the sale of Debtor's closed door long term care pharmacy assets that closed prior to the Petition Date which will be remitted to Lenders when received (the "**LTC Sale Proceeds**") and any causes of action and recoveries under chapter 5 of the Code (the "**Post-Petition Collateral**", and together with the Pre-Petition Collateral, and the Cardinal Post-Petition Collateral (defined below) the "**Collateral**").

33.     The Post-Petition Lien shall be subject and junior in priority only to the Cardinal Indebtedness to the extent the Agent's interests were subordinated to

it pursuant to the Cardinal Documents on the Petition Date and to any non-avoidable, perfected pre-petition liens in any Collateral which are superior in priority to the pre-petition liens of the Agent in such Collateral. Upon entry of the Order, the Post-Petition Lien shall be automatically deemed perfected.

34. With the exception of Cardinal's rights under the Order, nothing in the Order is or shall be considered a determination as to the type, nature, validity, priority, extent or amount of any other party's pre-petition security interest in property of the Debtor, and nothing in the Order shall alter, impair or limit any rights of any other party in personal property of the Debtor under Section 552(b) of the Code.

35. As adequate protection for, and to secure an amount of the Cardinal Indebtedness equal to the sum of the aggregate diminution subsequent to the Petition Date in the value of the Cardinal Collateral by depreciation, use, sale, loss, decline in market price or otherwise, the Order grants Cardinal a lien (the "**Cardinal Replacement Lien**") in all of the Debtor's right, title and interest in and to all of its tangible and intangible assets acquired by the Debtor after the Petition Date (the "**Cardinal Post-Petition Collateral**") to the same extent, validity and priority as the Cardinal Pre-Petition Lien (as determined in accordance with the Intercreditor Agreement). Upon entry of the Order, the Cardinal Replacement Lien shall be automatically deemed perfected.

36.     Although not required, Cardinal is authorized to file and record any instruments or documents necessary to perfect the security interests and liens granted by the Order and any such actions taken by Cardinal shall not be deemed a violation of the automatic stay.

37.     Because the Post-Petition Lien and Cardinal Replacement Lien provided to the Agent and Cardinal, respectively, as adequate protection as set forth herein may not be sufficient to adequately protect the interest of the Lenders, pursuant to the Order as additional adequate protection Lenders are also each granted allowed claims, with administrative priority for such claims under Section 507(b) of the Code in this case, arising from the Debtor's use of Cash Collateral. Such claims are granted in favor of Agent and Cardinal under the Order and shall have priority over all other costs and expenses of the kind specified in, or ordered pursuant to, Sections 105, 326, 330, 331 364(c), 503(b), 506(c), 507(a), or 726 of the code and shall at all times be senior to the rights of the Debtor and any creditors or claimants in this case or any subsequent case under the Code, with the exception of (i) all statutory fees of the United States Trustee, and (ii) costs of the Clerk of the Court.

38.     Further, pursuant to the Order unless the Agent otherwise specifically agrees in writing, no costs or expenses of administration which have been or may be incurred in these proceedings by the Debtor or others (including, but not limited

to, those specified in or ordered pursuant to the sections of the Code set forth above) and no priority claims against the Debtor may be imposed during the Use Period against the Agent or the Lenders, their claims, or the Collateral, as applicable, and no claims against the Debtor shall be prior to or on a parity with the claims of the Lenders against the Debtor or its estate for the Indebtedness, or with the Agent's security interests in or liens upon the Collateral, except (i) all statutory fees of the United States Trustee, and (ii) costs of the Clerk of the Court.

39.     Without prejudice to the rights of parties in interest as provided in Section 5.11 of the Order (but subject to any limitations with respect to such parties in interest as set forth herein), the Debtor on behalf of itself and its estate, is agreeing and stipulating (a) to the allowance of the Lenders' Pre-Petition Indebtedness and the Cardinal Indebtedness as claims pursuant to Section 502 of the Code in the amount due the Lenders according to the Lenders' books and records and due Cardinal according to its books and records as of the Petition Date, and (b) that the Agent's liens on and security interests in the Pre-Petition Collateral as first priority (except to the extent the Lenders have agreed to subordinate their liens to Cardinal pursuant to the Intercreditor Agreement), valid, perfected, enforceable and non-avoidable.

40.     The Debtor, under the Order, fully waives and releases any right it may have to challenge the claims of the Lenders or Cardinal as described therein,

or the validity, perfection or enforceability of the Pre-Petition Liens and Cardinal's liens in the Cardinal Collateral.

41.    Further, under the Order, but without prejudice to the rights of parties in interest as provided in Section 5.11 of the Order (but subject to any limitations with respect to such parties in interest as set forth therein), all defenses and claims of every kind or nature, whether existing by virtue of state, federal bankruptcy or non-bankruptcy law, by agreement or otherwise, against the Lenders, the Indebtedness and the Agent's liens in the Pre-Petition Collateral; and Cardinal, the Cardinal Indebtedness and Cardinal Pre-Petition Lien in the Cardinal Collateral, now existing or which may hereafter arise or accrue, are to be forever waived, relinquished and released by the Debtor, and its successors and assigns against the Lenders and Cardinal, as well as their respective successors and assigns, and their respective officers, agents, employees, representatives and attorneys, including, without limitation, claims under Sections 542, 544, 547, 548, 549, and 550 of the Code.

42.    Pursuant to the Order, as further adequate protection to the Lenders and Cardinal , the Debtor affirmatively waives any rights under Section 506(c) of the Code with respect to both the Lenders and the Collateral, and Cardinal and the Cardinal Collateral during the term of the Order, or any subsequent cash collateral order or any amendment to this Interim Order, and the Debtor, for itself and its

estate is prohibited from asserting that any costs or expenses of administration may be imposed upon the Lenders or the Collateral and Cardinal or the Cardinal Collateral pursuant to Section 506(c) of the Code or otherwise, without prior written consent of the Lenders or Cardinal respectively.

## LIMITED POST-PETITION FINANCING

43.     Pursuant to the Order, provided that Cardinal supplies inventory products to the Debtor Post-Petition on credit terms pursuant to the Prime Vendor Agreement (the "**Post-Petition Cardinal Indebtedness**"), Cardinal shall receive a Post-Petition lien on all of the Debtor's assets junior to the Post-Petition Lien and the Cardinal Replacement Lien on the pursuant to Section 364(c)(3) of the code (the "**Cardinal Post-Petition Lien**") in all of Debtor's right, title and interest in the Cardinal Post-Petition Collateral to the same extent, validity and priority as the Cardinal Pre-Petition Lien (as determined in accordance with the Intercreditor Agreement) to secure payment of the Cardinal Pot-Petition Indebtedness for inventory materials provided to the Debtor post-petition.

44.     Under the Order, the automatic stay of section 362 of the Bankruptcy Code is modified and the Debtor is authorized to pay the Cardinal Post Petition Cardinal Indebtedness according to the terms of the Prime Vendor Agreement.

## AUTHORITY TO USE CASH COLLATERAL

45.     Under the Order, but subject to the continued implementation of governance and management arrangements and restrictions with respect to the officers, directors and shareholders acceptable to the Lenders, including but not limited to, the governance and management of the Debtor by a Board of Directors elected by the Plan Administrator in the Kerr Bankruptcy Case who controls and votes all equity interests in the Debtor, until the until the earlier of (i) the conclusion of the Final Hearing (as defined in the Cash Collateral Order), or (ii) the time the Cash Collateral Order becomes a final order without necessity of a Final Hearing (the "**Interim Period**"), the Debtor may use Cash Collateral in an amount not to exceed $7,577,664 in the aggregate for the purposes set forth in the Budget (which includes payments to Cardinal in the amounts required by and pursuant to the terms of the Cardinal Line of Credit and the Cardinal Documents, subject to the terms of the Intercreditor Agreement and not to exceed the amounts set forth in the Budget for payments to Cardinal) attached to the Motion as Exhibit B (the "**Budget**"), which may be amended from time to time upon agreement of Lenders and Debtor, provided, however, that notwithstanding any other term of the Budget, (y) any line item expeditures budgeted during any week may be paid during the prior week, or any subsequent week and (z) the aggregate and cumulative expenditures of the Debtor may not exceed the amount of aggregate

and cumulative expenses set forth in the Budget by more than ten percent (10%), provided however, that payments to Cardinal in the line items in the Budget for any week may be paid during any prior week or any subsequent week notwithstanding the ten percent (10%) limitation in (y) above for cumulative expenditures, provided further that the aggregate expenditures do not exceed the ten percent (10%) limitation of (y) above.

46.     During the Interim Period, the Debtor is authorized by the Order to use Cash Collateral solely for the purpose of funding the ordinary and necessary costs and expenses to effectuate the sale of its assets, and, thereafter, winding down its business, including costs to preserve and protect all business, computer and other records necessary to investigate claims against third parties, as proposed by the Debtor as set forth in the Budget. The Order also provides that Cash Collateral may at any time be used by the Debtor to pay all statutory fees of the United States trustee and all costs of the Clerk of the Court; however, notwithstanding any provision of the Budget, Cash Collateral cannot under the Order be disbursed or otherwise used by the Debtor for the payment of any expenses not specifically included in the Budget without the prior written approval of the Agent or further order of the Court.

47.     Unless and until expended by the Debtor as authorized by the Order, all Cash Collateral remains pursuant to the Order subject to the liens and security

interests of the Agent under the Loan Documents and this Order. The Order requires the Debtor to pay to the Lenders, for application against the Indebtedness all proceeds of the sale of any of Debtor's assets outside the ordinary course of business including, but not limited to, the sale to CVS or such higher and better bid received by Debtor pursuant to any Order entered relating to the Bid Procedures Motion or Sale Motion.

## DEFAULT, RIGHTS, REMEDIES

48.    The following are an "**Event of Default**" under the Order: (i) any default under, or failure by the Debtor to perform, keep, or observe any term, provision, condition, covenant, warranty, promise, undertaking, or representation in the Order, the Loan Documents (other than specific defaults existing under the Loan Documents as of the Petition Date)  or as provided in writing to the Agent prior to the Petition Date, or any applicable Operating Instructions and Reporting Requirements from time to time promulgated by the Office of the United States Trustee, (ii) the occurrence of an Event of Default under the Kerr Cash Collateral Order, (iii) the Debtor shall fail to timely file any monthly operating reports required by the United States Trustee (all of which reports must be served upon the Agent simultaneously with their being filed with the Court), (iv) the Debtor confirms a plan of reorganization (or liquidation) that is unacceptable to the Lenders, (v) violation of any of the governance and management arrangements and

restrictions referenced in Section 1.1, (vi) the dismissal of this case, or conversion of the case to a case under chapter 7 of the Code, (vii) the appointment of an examiner for the Debtor or its estate, (viii) the entry of an order granting the Lenders relief from the automatic stay, (ix) any proceeding is commenced by the Debtor against the Agent or the Lenders to contest the Agent's liens in the Pre-Petition Collateral, to avoid any transfer under chapter 5 of the Code (other than with respect to the Agent's Mortgage on the Property), or to dispute the amount of the Indebtedness; or (x) the Debtor fails to timely accomplish any of the following acts in connection with the sale of its assets ("**Sale Milestones**"):

(a) Entry of an order approving sale and bid procedures on or about October 20, 2017;

(b) Conclusion of an auction (if required under any bid procedures order) of all or substantially all of the Debtor's assets on or before November 10, 2017;

(c) Entry of an order approving the sale in form and substance acceptable to the Lenders on or before November 13, 2017; and

(d) Consummation of the sale on or before December 8, 2017.

**[Space Intentionally Blank]**

**WHEREFORE,** Debtor prays that the Court enter the proposed Order attached as

Exhibit A hereto.

Respectfully submitted,


/s/ Jayson B. Ruff
Stephen M. Gross (P35410)
Jayson B. Ruff  (P69893)
Joshua A. Gadharf (P76860)
McDONALD HOPKINS PLC
39533 Woodward Avenue
Suite 318
Bloomfield Hills, MI  48304
Telephone: (248) 646-5070
Facsimile:  (248) 646-5075
E-mail: sgross@mcdonaldhopkins.com
        jruff@mcdonaldhopkins.com
        jgadharf@mcdonaldhopkins.com

PROPOSED COUNSEL FOR THE
DEBTOR
AND DEBTOR IN POSSESSION

Dated: October 13, 2017