**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| BILLNAT CORPORATION, | ) Case No. 1754357 |
| | ) |
| Debtor. | ) Judge |
| | ) |
| | ) |
| | ) |

**_CORRECTED_ MOTION FOR AN ORDER (I) AUTHORIZING THE DEBTOR TO ENTER INTO AGREEMENT FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS WITH SUCCESSFUL BIDDER AT AUCTION; (II) APPROVING THE ASSET PURCHASE AGREEMENT BETWEEN THE DEBTOR AND WOODWARD DETROIT CVS, L.L.C.; (III) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND TRANSFERRING LIENS TO PROCEEDS THEREOF; (IV) AUTHORIZING AND APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE DEBTOR'S EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF**

The above captioned debtor and debtor-in-possession (the "Debtor") hereby moves the Court, pursuant to sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of an order, substantially in the form attached hereto as Exhibit A, (the "Order") (i) authorizing the Debtor to enter into an agreement (or agreements if more than one bid is selected) for a sale of substantially all of Debtor's assets with the Stalking Horse or

Successful Bidder(s) (defined below) (the "Sale Agreements" and each a "Sale Agreement"); (i) authorizing the sale of substantially all of Debtor's assets free and clear of all liens, claims, encumbrances and interests and transferring liens to proceeds; (ii) authorizing the assumption and assignment of certain executory contracts; and (iii) granting related relief.

In support of this Motion, the Debtor respectfully represents as follows:

## I.    JURISDICTION

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of the Debtors' chapter 11 cases and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    BACKGROUND

**A.    The Debtor and its Chapter 11 Filings**

2.    On October 13, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is continuing in possession of its property and is operating and managing its businesses as a debtor in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.    No official committee of unsecured creditors has been appointed in this chapter 11 case.

4.     The Debtor is in the business of operating twenty retail pharmacies from leased facilities in Southeastern Michigan under the name "Sav-On Drugs". The Debtor's corporate headquarters is located in Livonia, Michigan.[1]

5.     The Debtor was solely owned by Mr. William G. Newman ("Mr. Newman") until all of its capital stock was acquired by the Frank W. Kerr Company ("Kerr") in exchange for Mr. Newman receiving additional shares of Kerr in a transaction that closed in August 2015, but was retroactively effective as of December 15, 2014.   Kerr was engaged in the business of selling wholesale pharmaceutical products to retail pharmacies, including the Debtor, and recently confirmed its Plan of Liquidation (the "Kerr Plan") in Case No. 16-51724 currently pending before this Court (the "Kerr Bankruptcy") and Kerr's assets are being liquidated and distributed pursuant the terms of the Kerr Plan.

6.     The Debtor is also a co-obligor of Kerr's obligations owed to JPMorgan Chase Bank, N.A., as Administrative Agent ("Agent"), and its capacity as a Lender, ("Chase") for itself and Comerica Bank ("Comerica", and with Chase, the "Lenders") related to Kerr's and the Debtor's secured financing agreements with the Lenders (the "Credit Agreement") pursuant to certain joinder agreements.   At present, the obligation to Lenders is approximately $41.5 million.

---

[1] The Debtor sold its Long Term Care Pharmacy business on September 29, 2017.

7.     The Debtor and Cardinal Health 110, LLC ("Cardinal") are parties to a Prime Vendor Agreement previously executed on December 1, 2012 and later superseded by a Prime Vendor Agreement, Contract No. 81875 effective August 1, 2016, under which Cardinal agreed to provide the Debtor with a revolving inventory line of credit in the aggregate amount of $3,000,000 to be used to fund purchases of inventory by the Debtor from Cardinal.  On June 24, 2016, the Debtor entered into a certain security agreement granting Cardinal liens on all of Debtor's assets, subject to the liens of Lenders, to secure all sums owed by Debtor for goods supplied by Cardinal, and a UCC-1 Financing Statement was filed by Cardinal on June 27, 2016 with the Michigan Department of State, No. 2016089582-2 to perfect Cardinal's security interests.

8.     Kerr is also the largest creditor of the Debtor, representing more than 90% of the Debtor's total debt excluding the obligations to the Lenders.  According to the books and records of both the Debtor and Kerr, the Debtor owes over $60 million in accounts payable to Kerr.

9.     T The Debtor has operated at a significant loss for years.  Its financial statements reflect a combined net loss of $11,437,327 for the four-year period ending December 31, 2016. However, after adjusting for a one-time credit issued to it by Kerr in 2016, the Debtor's real operational loss over that same four year period was actually approximately $27.3 million.

10.     As a part of the strategy to maximize value for all of the creditors of Kerr, as well as Debtor, after interviewing several investment bankers, the Debtor with the advice and consent of Lenders and approval from the Debtor's Board of Directors, retained SSG Advisors, LLC ("SSG") as its investment banker on June 14, 2016 to market the assets and seek a buyer for such assets.

11.     Prior to the Petition Date, Debtor was owed $1,799,164.00 (the "Huntsman Loan Balance") by Huntsman I, LLC ("Huntsman"), an entity owned and controlled by Mr. Newman.

12.     Prior to the Petition Date and following a period of negotiations, Debtor entered into a certain Standby and Settlement Agreement with Huntsman (the "Huntsman Agreement"), pursuant to which Huntsman agreed to grant Debtor the exclusive right to market and sell Huntsman's business and all of its real estate and personal property assets (the "Huntsman Assets") as a part of the sale process described in this Motion or any other disposition by Debtor in its sole discretion, in return for Debtor's agreement to accept a surrender of all of the Huntsman Assets in full satisfaction of the Huntsman Loan Balance. Pursuant to the Huntsman Agreement, Huntsman executed a Voluntary Surrender Agreement and other documents, which were placed into escrow with Debtor's counsel, that convey the Huntsman Assets to Debtor so that the Huntsman Assets will become property of the debtor and its estate at closing and can be conveyed to the Successful Bidder (as defined below) at closing. Contemporaneous with the filing of this Motion and out of

an overabundance of caution, Debtor has also filed a motion seeking the entry of and Order approving the Huntsman Agreement pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "<u>Huntsman Order</u>").

13.    In the ordinary course of its business operations, the Debtor directly employs approximately 330 individuals, none of which are union employees.

14.    Detailed facts about the Debtor and the reasons for the commencement of the chapter 11 case are set forth in the Affidavit and Statement of Jeffrey K. Tischler in Support of Chapter 11 Petitions and First Day Motions.

**B.    <u>Events Leading to the Sale</u>**

15.    Since commencing its marketing process in July 2016, the Debtor received many expressions of interest from potential strategic and financial buyers interested in purchasing substantially all of its assets on a going concern basis, as well as liquidators interested in acquiring all or some of its assets.

16.    The Debtor, utilizing the support of SSG and in consultation with the Lenders as well as disclosure to the Official Unsecured Creditors Committee of Kerr (the "<u>Kerr UCC</u>"), responded to these potential buyers by executing confidentiality agreements, providing them with a Confidential Offering Memorandum, and assisting them with due diligence, including providing access to an electronic data room and soliciting letters of intent and indications of interest.

17.    After months of due diligence being conducted by prospective buyers and months of negotiations with prospective buyers, all done in consultation with the

Lenders and disclosure to the Kerr UCC, the Debtor entered into the Stalking Horse Purchase Agreement, attached as Exhibit B hereto (the "Stalking Horse Purchase Agreement") for the sale of substantially all of the Debtor's assets, with Woodward Detroit CVS Pharmacy, L.L.C., which will be the "stalking horse" bidder (the "Stalking Horse") under the proposed Bidding Procedures discussed below.

18.    Because the Debtor has engaged in a thirteen (13) month long, thorough marketing and negotiation process before selecting, after consultation with the Lenders and disclosure to the Kerr UCC, Debtor believes that the Stalking Horse Purchase Agreement reflects the highest and best valuation of the Purchased Assets (as defined below) prior to the completion of the same process discussed below.

19.    The assets to be sold include all tangible and intangible assets and personal property owned by Debtor, including the Huntsman Assets, and used to operate and conduct the Debtor's and Huntsman's retail pharmacy business operations as a whole or, alternatively, may consist of the assets used to operate and conduct Debtor's or Huntsman's retail pharmacy business operations from specific leased facilities individually (collectively, "Purchased Assets").    Excluded Assets include, without limitation, the Debtor's Long Term Care Pharmacy related assets that were previously sold on September 29, 2017 to another purchaser, all executory contracts and unexpired leases, including those constituting Huntsman Assets, that are not assumed and assigned to the Purchaser under section 365 of the Bankruptcy Code; all claims and causes of action against third parties, including all claims under

chapter 5 of the Bankruptcy Code; any and all state law fraudulent transfer and similar causes of action and any claims against Debtor's equity owners, officers, directors, employees, agents, representatives or professionals; and Debtor's and Huntsman Assets constituting bank accounts, cash and cash equivalents including cash in registers at closing, accounts receivable, tax refunds, and life insurance policies; as well as the proceeds of all of the foregoing (collectively, "Excluded Assets").

**C.    Sale Milestones and Bid Procedures**

20.    Simultaneously with the filing of this Motion, the Debtor is filing with this Court a motion seeking entry of a certain *Order Authorizing Debtor to Use Cash Collateral and Granting Adequate Protection on an Interim Basis Pending Final Hearing* (the "Cash Collateral Order").

21.    Pursuant the Cash Collateral Order, if entered, the Court will find that on the Petition Date, the Debtor was indebted to the Lenders in the principal amount of $41,511,824 pursuant to the Pre-petition Loan Documents (as defined in the Cash Collateral Order), plus costs, fees, expenses and interest (the "Pre-Petition Obligations"), which were secured by all of the Debtor's assets on the Petition Date.

22.    Pursuant to the Cash Collateral Order, if entered, the Debtor will be authorized to use cash collateral securing the Pre-Petition Obligations and, as adequate protection for such use of cash collateral, the Lenders will be granted

replacement liens in all of Debtor's post-petition assets and an adequate protection superpriority claim pursuant to section 507(b) of the Bankruptcy Code.

23.     Pursuant to the Cash Collateral Order, if entered, it will be an Event of Default if the Debtor fails to meet the following milestones for the sale of substantially all of its assets (the "Sale Milestones"):

(a)     Entry of an order approving sale and bid procedures on or before October 20, 2017;

(b)     Conclusion of an auction of all or substantially all of the Debtor's assets (the "Auction") on or before November 10, 2017;

(c)     Entry of an order approving the sale in form and substance acceptable to the Lenders on or before November 13, 2017; and

(d)     Consummation of the sale on or before December 8, 2017.

21.     In order to meet the required Sale Milestones and in an effort to maximize its values, Debtor filed its *Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 363 and 365, Bankruptcy Rules 2002 and 6004, and Local Rules 6004-1 and 9014-1 (a) Establishing Bidding Procedures for the Sale of Substantially all of Debtor's Assets Fee and Clear of Liens, Claims and Encumbrances and Transferring Liens to Proceeds; (b) Scheduling an Auction and a Sale Hearing to Consider Approval of Sale; (c) Establishing Procedures for the Assumption and Assignment of Executory Contracts; (d) Approving the Form of Asset Purchase Agreement, Form and Manner of the Auction Notice, the Form of the Notice to Non-Debtor Co-Parties*

*to Executory Contracts, and the Notice of Sale Hearing* [filed at Docket No. 25] (the "Bid Procedures Motion")

22.    Pursuant to the sale process detailed in the Bid Procedures Motion (the "Bid Procedures"), the Debtor has been and will continue soliciting Qualified Bids from Qualified Bidders (as such terms are defined in the Bid Procedures Motion) until November 9, 2017 at 5:00 PM Eastern Time and shall, if one or more Qualified Bids are received, hold an auction on November 10, 2017 at 9:00 a.m. at the offices of McDonald Hopkins PLC, 39533 Woodward Ave., Suite 318, Bloomfield Hills, Michigan, 48304 (the "Auction")[2].

23.    If the Auction is held, the Debtor proposes conducting the Auction as described for in the Bid Procedures Motion and to sell the Purchased Assets to the Successful Bidder, as determined by the Debtor after consultation with the Lenders, pursuant to the Successful Bidder Purchase Agreement and, if no Auction is held (because the Debtor received no Qualified Bids), the Debtor proposes to sell the Purchased Assets to the Stalking Horse pursuant to the terms of the Stalking Horse Purchase Agreement.

24.    Pursuant to the Bid Procedures Order, the Court will schedule a hearing (the "Sale Hearing") on the Motion to determine if a sale to the Stalking Horse or Successful Bidder(s) (the "Proposed Sale") should be approved.

---

[2]Auction location may be changed in order to facilitate the anticipated number of attendees that will be at the Auction depending on the number of Qualified Bids received by the Bid Deadline.

### III.    RELIEF REQUESTED

25.    By this Motion, the Debtor seeks entry of an order (i) authorizing the Debtor to sell the Purchased Assets to the Stalking Horse if no Auction is held (because the Debtor received no Qualified Bids) or to enter into the Successful Bidder Purchase Agreement(s) with the Successful Bidder(s) selected by Debtor in accordance with the Bid Procedures; (ii) authorizing the sale of the Purchased Assets to the Stalking Horse or the Successful Bidder(s), as the case may be (the "Purchaser"), free and clear of all liens, claims, encumbrances and interests and transferring liens to proceeds; (iv) authorizing the assumption and assignment of the Assumed Contracts;  and (v) granting related relief.

### BASIS FOR RELIEF

**A.    The Sale Was Negotiated in Good Faith and Made for Sound Business Reasons; the Purchase Price Is Fair and Reasonable**

26.    Section 363(b) of the Bankruptcy Code specifically authorizes asset sales outside the ordinary course of business.  *See* 11 U.S.C. § 363(b)(1) ("[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate").  Section 105(a) of the Bankruptcy Code also provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

27.     In approving the sale of assets outside the ordinary course of business and outside of a chapter 11 plan pursuant to section 363 of the Bankruptcy Code, courts, including those in the Sixth Circuit, have adopted the "sound business reason" test established by the Second Circuit in *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983). *See Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986); *In re Nicole Energy Servs., Inc.*, 385 B.R. 201, 230 (Bankr. S.D. Ohio 2008); *In re Jillian's Entm't Holdings*, 327 B.R. 616, 617 (Bankr. W.D. Ky. 2005) (stating that the *Lionel* standard has been adopted by the vast majority of courts); *see also In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (Bankr. D. Del. 1991) (holding that transactions should be approved under section 363(b)(1) when: (a) they are supported by the sound business judgment of a debtor's management; (b) interested parties are provided with adequate and reasonable notice; (c) the sale price is fair and reasonable; and (d) the purchaser is acting in good faith).

28.     A debtor's showing of sound business justification need not be unduly exhaustive; instead the debtor or trustee is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient business reasons to justify a sale depends upon the facts and circumstances of each case.  *See Lionel*, 722 F.2d at 1071.  Bankruptcy courts are given substantial discretion in deciding whether to authorize a sale of a debtor's assets outside of the ordinary course of business.  *See In re Chateaugay Corp.*, 973 F.2d 141, 144 (2d Cir. 1992).

29.     In the instant case, several strong business reasons exist to support the sale of the Purchased Assets at this time to the Purchaser.  First and foremost, the Stalking Horse Purchase Agreement was negotiated following Debtor's robust marketing process that had been ongoing for ten months.  A sale to the Stalking Horse pursuant to the Stalking Horse APA will result in the Debtor and its estate receiving approximately $15,538,330 (the "Purchase Price") for the Purchased Assets, which is subject to certain adjustments specified in the Stalking Horse Purchase Agreement.  This does not include the value of excluded assets retained by the Debtor, which is estimated to be approximately $9,051,499 prior to the bringing of claims, resulting in Debtor realizing a total of $24,589,829.  However, if the Stalking Horse is able to secure leases on certain other locations leased by the Debtor on terms acceptable to the Stalking Horse, the Purchase Price increases for each such location which can result in an increase of $6,000,000 to the Purchase Price.  Any sale to a Purchaser following the Bid Procedures will be upon terms in a Sale Agreement that are as good or better than those contained in the Stalking Horse Purchase Agreement and will be a going-concern sale that is designed to maximize the financial recovery to the Debtor's estate.

30.     Second, the authority to use cash provided under the Cash Collateral Order, if entered, expires on December 8, 2017, and Debtor does not believe it will be able to extend the use of cash collateral.  Accordingly, if the proposed asset sale does not close, Debtor will in all likelihood have no ability to use cash and it will be left

the untenable position of being unable to pay its key suppliers of pharmaceuticals, its payroll and its other expenses.  In short, if a going-concern sale is not consummated, a forced sale liquidation and significant resulting loss of value to the estates of both the Debtor and Kerr will likely follow.

29.    The Lenders and Debtor have also approved the concept of a sale in the Cash Collateral Order.

30.    Additionally, the incidental impact of Debtor's bankruptcy to interested stakeholders will be minimized by the proposed asset sale described herein.   For example, many executory contracts will be assumed; some of Debtor's locations will continue to operate; and the Purchaser will hire certain of Debtor's current employees.

31.    The sale is designed to preserve and enhance the value of the Purchased Assets as a whole, and to ensure that the Assigned Contracts and Assumed Liabilities are assigned while they have their highest value and prior to any risk of a premature termination.  The proceeds from sale of the Purchased Assets will also add significant value to the Debtor's estate, and is therefore in the best interest of creditors.  Such a sale will return a greater benefit to the Debtor's estate than any of the alternatives, including a sale of the Purchased Assets at a future date, or the continued maintenance of the Purchased Assets by the Debtor.

32.    The Stalking Horse Purchase Agreement is the product of good faith and arm's length negotiations and is on commercially reasonable terms.  The Debtor and

Stalking Horse, with the assistance of their professional advisors, negotiated the terms of the Stalking Horse Purchase Agreement and a sale to the Purchaser pursuant to the Stalking Horse Purchase Agreement or the Successful Bidder Purchase Agreement determined pursuant to the Bid Procedures will ensure that the Debtor will receive the value and benefit of those negotiations or better.

**B.**    **The Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, and Interests**

33.    Section 363 of the Bankruptcy Code authorizes a debtor to use, sell or lease property of the estate outside the ordinary course of business free and clear of any interest in such property. Section 363(f) of the Bankruptcy Code authorizes the sale of estate property free and clear of interests in such property held by an entity if:

(1)    applicable nonbankruptcy law permits a sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see generally In re Leckie Smokeless Coal Co*., 99 F.3d 573 (4th

Cir. 1996); *In re Gulf States Steel*, *Inc. of Ala.*, 285 B.R. 497, 506 (Bankr. N.D. Ala.

2002). The "interests" in property that assets may be sold "free of" include liens,

claims, encumbrances, and other interests. *See Leckie Smokeless*, 99 F.3d at 581-582

(scope of section 363(f) not limited to in rem interests); *In re Aneco Elect. Const.,*

*Inc*., 377 B.R. 338 (Bankr. M.D. Fla. 2006); *see also In re Appalachia Fuels, LLC*,

503 F.3d 538 (6th Cir. 2007) (approving a sale free and clear of "claims" arising as

coal commission sales).

34. Because section 363(f) of the Bankruptcy Code is drafted in the

disjunctive, satisfaction of any one of its five requirements will suffice to permit the

sale of the Purchased Assets "free and clear" of all interests, except with respect to

any interests that are liabilities to be assumed under the asset purchase agreement.

*See Gulf States*, 285 B.R. at 506; *Citicorp Homeowners Servs., Inc. v. Elliot* (*In re*

*Elliot*), 94 B.R. 343, 345 (E.D. Pa. 1988).

35. The Debtor submits that any such lien or encumbrance will be

adequately protected by either being paid in full at the time of closing, or attaching to

the proceeds of the sale, subject to any claims and defenses the Debtor may possess

with respect thereto. The Debtor accordingly requests authority to convey the

Purchased Assets to Purchaser, free and clear of all liens and encumbrances except

any assumed liabilities under the express terms of the Purchase Agreement, with such

liens and encumbrances to attach to the proceeds from the sale of the Purchased

Assets, with the same validity, extent, priority, and perfection as existed immediately prior to the sale.

36.     Lastly, the Debtor submits that the sale should not expose the Purchaser to any liability as a successor of the Debtor or its estate. Courts have also consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business. *See*, *e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d at 585 (affirming the sale of debtors' assets free and clear of certain taxes); *In re Insilco Techs., Inc.*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); *see also In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[I]n personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction.").

37.     Accordingly, the Court should approve the sale of the Purchased Assets to Purchaser free and clear of liens and encumbrances under section 363(f) of the Bankruptcy Code, and all potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims.

**C.** **Purchaser Constitutes a Good Faith Purchaser Subject to the Protections of Section 363(m) of the Bankruptcy Code**

38.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(n) of the Bankruptcy Code, among other things, provides, in turn, that a trustee may avoid a sale under such section if the sale price was controlled by an agreement among potential bidders at the sale.  Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." *In re Abbott's Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *see also In re Made In Detroit, Inc.*, 414 F.3d 576, 581 (6th Cir. 2005) (following the *Abbotts Dairies* standard).

39.     As explained above, the Stalking Horse Purchase Agreement is the product of good faith and free from self-dealing and the Purchase Agreement selected by Debtor pursuant to the Bid Procedures will ultimately contain as good or better terms and conditions.  The Debtor intends to establish at the Sale Hearing on this matter that the Purchase Agreement was a negotiated, arm's length transaction, in which Purchaser has acted in good faith, without collusion or fraud of any kind, and

in compliance with the *Abbotts Dairies* standard. The evidence will further establish that neither the Debtor nor Purchaser has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or allow the Debtor to avoid the sale pursuant to section 363(n) of the Bankruptcy Code with respect to the consummation of the sale transaction or the transfer of the Purchased Assets and the assignment of the Assigned Contracts and Assumed Liabilities to Purchaser.

40. In light of the foregoing, the Debtor requests that the Court find that Purchaser has purchased the Purchased Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code, and is entitled to the protections of section 363(m) of the Bankruptcy Code.

**D.** **The Court Should Authorize the Assumption and Assignment of Executory Contracts and Unexpired Leases**

41. The Debtor further requests that the order approving the sale provide that the Assigned Contracts and Assumed Liabilities will be assigned to, and remain in full force and effect for the benefit of Purchaser, notwithstanding any provisions in the Assigned Contracts and Assumed Liabilities, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment.

42. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of

the debtor." 11 U.S.C. § 365(a). Section 365(b)(1), in turn, clarifies the requirements

for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee --

> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default [ ];

> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

43.     Section 365(f) of the Bankruptcy Code provides, in pertinent part, that

the trustee may assign an executory contract or unexpired lease of a debtor only if:

> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f).

44.     Courts generally apply the "business judgment" and "benefit to the

estate" test to determine whether or not to authorize a debtor assume an executory

contract." *In re Greektown Holdings, L.L.C.*, No. 08-53104, 2009 WL 1653461, at

*1 (Bankr. E.D. Mich. May 13, 2009) (citation omitted); *see also In re Structurelite*

*Plastics Corp.*, 86 B.R. 922 (Bankr. S.D. Ohio 1988). A debtor satisfies the "business judgment" test when it determines, in good faith, that assumption of an executory contract will benefit the estate and the unsecured creditors. Under this test, courts routinely approve motions to assume or reject executory contracts or unexpired leases upon a showing that the debtor's decision is an exercise of sound business judgment and will benefit the debtor's estate. *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993) (stating that section 365 of the Bankruptcy Code "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject."); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that the traditional standard applied by courts under section 365 is that of "business judgment"); *Edwin C. Levy Co. v. McLouth Steel Corp. (In re McLouth Steel Corp.)*, 20 B.R. 688, 692 (Bankr. E.D. Mich. 1982) ("In determining whether a certain contract should be assumed or rejected, the decision should rest on the business judgment of the debtor.").

45. Courts will generally not second guess a debtor's business judgment concerning the assumption or rejection of an executory contract or unexpired lease. *See In re Riodizio, Inc.*, 204 B.R. 417, 424 (Bankr. S.D.N.Y.) ("[A] court will ordinarily defer to the business judgment of the debtor's management"); *accord Phar-Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R 948, 951-52 (Bankr. N.D. Ohio

1997) ("Whether an executory contract is 'favorable' or 'unfavorable' is left to the sound business judgment of the debtor . . . . Courts should generally defer to a debtor's decision whether to reject an executory contract."). The business judgment test is not a strict standard; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the debtor. *See In re Greektown Holdings, L.L.C.*, 2009 WL 1653461 at *1.

46.     The assumption and assignment of the Assigned Contracts and Assumed Liabilities is integral to the Purchase Agreement and is in the best interests of the Debtor, its estate, its creditors, and other parties in interest, and represents the exercise of sound and prudent business judgment by the Debtor.[3] The Debtor submits that Purchaser will not be able to effectively utilize the Purchased Assets without the right to retain the benefits of the Assigned Contracts and Assumed Liabilities. Therefore, if the Debtor does not assign the Assigned Contracts and Assumed Liabilities to Purchaser, the Debtor has reason to believe that Purchaser would either significantly reduce its purchase price or completely withdraw its offer to purchase the Purchased Assets.

---

[3] The inclusion of any agreement as an Assigned Contract does not constitute an admission by the Debtor that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtor expressly reserves the right to challenge the status of any agreement included as an Assigned Contract.

47.     Pursuant to the Purchase Agreement and in compliance with the Bid Procedures, the Debtor will pay all cure amounts owed (as determined by the Bid Procedures) in connection with any current Assigned Contracts and Assumed Liabilities that may be assigned to Purchaser.   Except to the extent otherwise provided in the Purchase Agreement, the Debtor requests that Purchaser not be subject to any liability to a counterparty to any of the Assigned Contracts and Assumed Liabilities that accrued or arose before the closing of the sale of the Purchased Assets, and that the Debtor be relieved of all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

## **WAIVER OF RULES 6004 AND 6006**

48.     Given the December 8, 2017, expiration of the Cash Collateral Order, if entered, time is of the essence in completing this transaction.   Further, the notice contemplated in this Motion is calculated to give reasonable notice to all affected parties.   Accordingly, Debtor asserts that cause exists to waive the requirements of Fed. R. Bankr. P. 6004(g) and 6006(d), and Debtor requests that the Order approving the sale (as well as the assumption and assignment of the Assigned Contracts and Assumed Liabilities) provide that it shall be effective immediately and that the 10-day stay shall not apply to the sale transaction and the assumption and assignment of the Assigned Contracts and Assumed Liabilities.

## NOTICE

49.     No trustee, examiner or official committee has been appointed in this chapter 11 case. Notice of this Motion has been served on the following parties or, in lieu thereof, to their counsel, if known: (i) the United States Trustee for the Eastern District of Michigan; (ii) those creditors listed on the Debtor's List of Creditors Holding 20 Largest Unsecured Claims; (iii) the Debtor's prepetition secured lenders; and (iv) the Debtor's state, local, and federal taxing authorities. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice need be given.

**[Space Intentionally Blank]**

WHEREFORE, the Debtor requests that the Court enter an order (a) in substantially the form presented in Exhibit A (i) authorizing the Debtor to enter into the Sale Agreements with the Purchaser; (ii) authorizing the sale of the Purchased Assets to the Purchaser free and clear of all liens, claims, encumbrances, and interests pursuant to section 363 of the Bankruptcy Code and transferring liens to proceeds; and (iii) granting such other and further relief as is necessary and proper.

Respectfully submitted,

/s/ Jayson B. Ruff
Stephen M. Gross (P35410)
Jayson B. Ruff (P69893)
Joshua A. Gadharf (P76860)
McDONALD HOPKINS LLC
39533 Woodward Avenue
Suite 318
Bloomfield Hills, MI  48304
Telephone: (248) 646-5070
Facsimile:  (248) 646-5075
E-mail: sgross@mcdonaldhopkins.com
           jruff@mcdonaldhopkins.com
           jgadharf@mcdonaldhopkins.com

PROPOSED COUNSEL FOR THE DEBTOR
AND DEBTOR IN POSSESSION

Dated: October 16, 2017